# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RICHARD J. MENKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 04-1456 |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY, UNITED STATES | ) | |
| COAST GUARD, and ASSISTANT | ) | |
| COMMANDANT JAMES F. AMOS,[1] | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION
(September 25, 2009) [#23, #24]

This case concerns a dispute between Richard J. Menkes ("Menkes"), a ship pilot,
and an association of registered pilots responsible for ensuring pilotage services in certain
areas of the Great Lakes pursuant to a delegation from the Coast Guard.  Menkes, in
essence, wants to be a ship pilot on certain areas of the Great Lakes without being a
member of the St. Lawrence Seaway Pilots' Association (the "Association").

In 2004, Menkes filed suit against the Department of Homeland Security, the
United States Coast Guard, and then-Assistant Commandant T.H. Gilmour, alleging they
violated his constitutional and statutory rights in deciding that the Coast Guard's order to
dispatch him would expire at the end of 2003, and that the Coast Guard would thus have

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an
action in his official capacity ceases to hold office, the court will automatically substitute that
officer's successor.  Accordingly, the Court substitutes James F. Amos for T.H. Gilmour.

to determine whether his services would be needed for 2004.[2]  This Court granted the

Coast Guard's summary judgment motion.  But the Court of Appeals reversed and

remanded the case to this Court to issue an order remanding the case back to the Coast

Guard for further proceedings and an adequate explanation of the basis for its decision

and the basis for its interpretation of the apposite statutes and regulations.  *Menkes v.*

*Dep't of Homeland Sec.*, 486 F.3d 1307 (D.C. Cir. 2007).

On remand, the Coast Guard again denied Menkes's claims, but provided further

explanation for its previous decision.  Before this Court are new Motions for Summary

Judgment filed by the parties.  Specifically, Menkes argues the Coast Guard violated the

Administrative Procedures Act, his First Amendment's guarantees of free association, and

the Due Process Clause.  This Court disagrees and DENIES Menkes's motion and

GRANTS the defendants' motion.

## BACKGROUND[3]

A pilot is required for certain types of ships to navigate through specific areas of

the Great Lakes.  *See* 46 U.S.C. §§ 9301 *et seq.*; *see also* 46 C.F.R. § 401.300(a).  To

provide pilotage services efficiently, the statute allows the Coast Guard to establish

---

[2]Menkes also filed suit in the Second Circuit against the Association itself alleging the
Association violated federal antitrust and state business laws, and the First Amendment freedom
of association.  *Menkes v. St. Lawrence Seaway Pilots' Ass'n*, 269 Fed. Appx. 54, 55 (2d. Cir.
2008).

[3]For additional background, see *Menkes v. Department of Homeland Security*, 486 F.3d 1307
(D.C. Cir. 2007), and *Menkes v. Department of Homeland Security*, 402 F. Supp. 2d 204 (D.D.C.
2005).

"pilotage pools" formed by associations of registered pilots.  46 U.S.C. § 9304.  Under the Coast Guard's regulations, the Coast Guard can order a non-Association member to provide pilotage services when the Association is not providing pilotage services "because of a physical or economic inability to do so."  46 C.F.R. § 401.720(b). According to the Coast Guard, this regulation gives associations, and not the Coast Guard, the primary responsibility for dispatching pilots, and forecloses the Coast Guard's ability to appoint independent pilots *unless* the Association is incapable of providing services.  According to Menkes, the Coast Guard had been dispatching him for three years without consistently applying or interpreting this regulation, thus indicating that its decision to allow his dispatch order to expire before the 2004 season was arbitrary and capricious.

Menkes quit the Association in 2000, but he wanted to continue providing pilotage services as an independent pilot.  The Coast Guard's Director of Great Lakes Pilotage at the time, Frank J. Flyntz, determined that the Coast Guard could continue to dispatch Menkes notwithstanding his lack of Association membership.  In explaining his decision, Flyntz stated that under the statute, the Coast Guard may authorize associations that are "voluntary."  (Flyntz letter, 03/07/01, Joint Appendix [Dkt. # 23-2] ("JA") 120) (citing 46 U.S.C. § 9304)).  Flyntz also stated Menkes had "a vested property right in the certificate of registration." (*Id.*)  Although the Coast Guard had not yet clarified its interpretation of Flyntz's decision when this case was before our Court of Appeals, the Coast Guard has

3

since explained that Flyntz's broad interpretation of the regulation was never the Coast Guard's official interpretation. Indeed Flyntz's decision was appealed, and upheld on much narrower grounds. (Agency Decision on Remand at 10 [Dkt # 21-2].)

In upholding Flyntz's decision that Menkes could continue to be dispatched, then-Director Jeffrey High ("Mr. High") did not base his decision on either the "voluntary" nature of associations or a finding that Menkes had a property right in being dispatched. To the contrary, Mr. High determined that under the regulation, Flyntz had the authority to dispatch Menkes because the Association was unable to provide adequate pilotage services. (High letter, 5/22/01 at 3 (JA 116).)

In 2003, the Association wrote to Flyntz's replacement, Paul M. Wasserman, and explained that the Association could provide adequate services and thus the Coast Guard lacked authority under the regulation to appoint independent pilots. (St. Lawrence Seaway Pilots' Association letter, 8/20/03 (JA 87).) When Wasserman responded, he never disputed that he lacked authority to appoint independent pilots if the Association provided adequate services, (Wasserman 10/22/03 letter (JA 83–84)), contending instead that the Association remained unable to provide adequate services because management policies had led to an attrition problem. (*Id.*) Thus, because the Coast Guard was incapable of providing adequate services, Wasserman concluded that it could continue to appoint Menkes as an independent pilot.

4

In December 2003, Menkes wrote Wasserman complaining about the Association and seeking the Coast Guard's approval to take steps to prepare for being dispatched in the 2004 season as an independent pilot. (Menkes letter, 12/15/03 (JA 69–70).) Wasserman wrote to both Menkes and the Association explaining that Menkes's dispatch as an independent pilot was predicated on the former director's determination that the Association was unable to provide adequate services for the remainder of the 2003 season. (Wasserman letter, 12/29/03 (JA 66–67).) Accordingly, Wasserman concluded that Menkes could be dispatched until the end of that season. However, because he believed the Association would likely be able to provide services for the 2004 season, Wasserman informed him that Menkes's appointment would "naturally expire" at the end of the 2003 season. (*Id.*) Wasserman, of course, would continue to monitor the Association's ability to provide services in the 2004 season. (*Id.*) Indeed, the next month, Wasserman again clarified to Menkes that his status as an independent pilot was not permanent, but was contingent on the Coast Guard's determination that the Association was unable to provide the necessary services. (Wasserman letter, 01/22/04 (JA 63) (noting that Menkes's "status as an independent pilot has been predicated on a determination by [Wasserman's] office that an extraordinary circumstance exists").) Menkes contends, amazingly, these letters from Wasserman were his first indication that his appointment was not permanent.

Menkes appealed Wasserman's decision within the Coast Guard, and his appeal was denied by Rear Admiral T.H. Gilmour in April 2004. (Gilmour letter, 04/12/04 (JA 58–59).) Gilmour noted Menkes had "some fundamental misunderstandings concerning Great Lakes pilotage and the status of Captain Menkes as an independent pilot." (*Id.*) Specifically, Gilmour explained that under the regulation, Menkes's appointment as an independent pilot was predicated on the Coast Guard's determination that the Association is incapable of providing adequate pilotage services. (*Id.* (citing 46 C.F.R. § 401.720(b)).)

Menkes appealed Gilmour's decision, and this Court granted the Coast Guard's Motion to Dismiss. *See Menkes*, 402 F. Supp. 2d at 210. The Court of Appeals disagreed and ordered a remand to this Court for the purpose of remanding the matter to the Coast Guard for further explanation of its decision to allow the order to expire. *Menkes*, 486 F.3d at 1315. In particular, the Court of Appeals relied largely on the broad language from Flyntz's determination and expressed concern that the Coast Guard had changed its interpretation of the regulation. *Id.* On remand, the Coast Guard again denied Menkes's APA claim and provided further explanation for its previous decision. Not surprisingly, Menkes appealed to this Court, alleging violations of the APA, freedom-of-association right under the First Amendment, and his due process rights. For the following reasons this case too must be dismissed.

## ANALYSIS

Both parties have filed Motions for Summary Judgment.[4]  Summary judgment is appropriate if the case record "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## I.    APA Analysis

The Court sets aside an agency action only when the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).  Additionally, an agency action is arbitrary

---

[4]Menkes's memorandum in support of his motion for summary judgment exceeded page limitations allowed by the local rules, which provide that a "memorandum of points and authorities in support of or in opposition to a motion shall not exceed 45 pages . . . without prior approval of the court." Local Rule LCvR 7(e). The Coast Guard has moved to strike the memorandum because it is forty-seven pages, or two pages over the limit. This Court has discretion to accept the memorandum, despite it violating the local rules, and, given the *de minimis* nature of the violation and the drastic nature of striking Menkes's motion, this Court exercises its discretion and accepts Menkes's memorandum in its entirety. *See United States* ex rel. *K & R Ltd. Partnership v. Mass. Hous. Fin. Agency*, 456 F. Supp. 2d 46, 56 (D.C. Cir. 2006) (noting motions to strike "are strongly disfavored, and the decision of whether to strike all or part of a pleading or attachment thereto rests within the sound discretion of the court").

and capricious if the action is an unexplained change in policy from past decisions. *Intercity Transp. Co. v. United States*, 737 F.2d 103, 108 (D.C. Cir. 1984).

### A.    Defining the Administrative Record

Before analyzing Menkes's APA claim, a word is necessary regarding the scope of the administrative record. Generally, courts can review decisions of administrative agencies based only on the record that was available to the agency at the time it made its decision. *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623–24 (D.C. Cir. 1997).

In this case, however, the Court must now consider additional evidence because, as the Court of Appeals found, the Coast Guard's failure to explain its action precluded effective judicial review. *Menkes*, 486 F.3d at 1314–15 (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)). As a result, this Court will now consider both the agency's explanation, as provided by Wasserman's 2007 affidavit, (Decl. of Paul Wasserman, Exhibit 9 [Dkt. #21-12]), and the Coast Guard's Decision on Remand, (Decision on Remand [Dkt. #23-2]), but only to the extent that it is explaining its previous justification. The Coast Guard cannot provide new justification for its actions because "[t]he validity of the [agency's] action must . . . stand or fall on the propriety of" the Coast Guard's initial justification for not dispatching Menkes. *Camp*, 411 U.S. at 143.

The Coast Guard's final agency action was based on 46 C.F.R. § 401.720(b), which provides that the director has authority to dispatch independent pilots only if the Association is incapable of doing so. (Gilmour letter, 04/12/04 (JA 58–59).) Thus, to the

8

extent the Coast Guard's Decision on Remand and the newly submitted Wasserman declaration further explains the previously stated rationale, this Court will consider it. *See Camp*, 411 U.S. at 142–43.

Thus, Menkes's unsubstantiated argument that this Court should permit him to conduct discovery, (Mem. in Support of Pl's Cross-Motion for Summ. J. [Dkt. # 24] ("Pl's Cross-Mot.") at 2), and rely on additional evidence outside of the record, (*Id.* at 15 n.7), is to no avail.  Only in narrow circumstances when a party makes a "strong showing of bad faith or improper behavior" can the record be supplemented.[5] *IMS, P.C.*, 129 F.3d at 624 (internal quotation omitted).

Menkes does not specifically attempt to establish this strong showing.  To the contrary, he asks this Court to assume the Coast Guard acted in bad faith. (Pl's Cross-Mot. at 14.)  Menkes's vague allegations of bad faith appear to be based only on the extra-record evidence itself, which this Court cannot consider, and on the Coast Guard's alleged inconsistency in interpreting and applying the regulation.  (*Id.* at 14–16.) However, as explained below, this Court finds the Coast Guard was *not* inconsistent in interpreting and applying the regulation.  Menkes has thus failed to make a sufficient

---

[5]This is because "the reasonableness of the agency's action is judged in accordance with its stated reasons," so "[a]gency deliberations not part of the record are deemed immaterial." *In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*, 156 F.3d 1279, 1279 (D.C. Cir. 1998).  Indeed, Menkes cannot ever use extra-record evidence to make this strong showing. *San Luis Obispo Mothers for Peace, et al., v. U.S. Nuclear Reg. Comm'n*, 789 F.2d 26, 45 (D.C. Cir. 1986) ("Petitioners must make the requisite showing *before* we will look at the transcripts.  We will not examine the transcripts to determine if we may examine the transcripts.").

showing the agency acted in bad faith, and thus the Court will not permit discovery or consider additional extra-record evidence. *See Baptist Mem. Hosp.-Golden Triangle v. Sebelius*, 566 F.3d 226, 230 (D.C. Cir. 2009); *IMS, P.C.*, 129 F.3d at 624; *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998).

### B.     APA Discussion

On remand, the Coast Guard further explained its interpretation of the regulation. Specifically, the Coast Guard elaborated on: (1) its interpretation of the word "voluntary," (2) its interpretation of the phrase "extraordinary circumstances," and (3) its determination that Menkes's status as an independent pilot would "naturally expire" at the end of the 2003 season because the Association was likely to be capable of providing services in 2004. With respect to these points, the Coast Guard's interpretation of its regulations has been both reasonable and consistent with its longstanding policy.

#### 1.     Voluntary Association

In response to the Court of Appeals's directive to "come to grips with the meaning of the statute, and, particularly, the meaning of the term 'voluntary association,'" *Menkes*, 486 F.3d at 1314, the Coast Guard has explained that the phrase 'voluntary association' does not mean that a certified pilots' association must "dispatch every registered, licensed and qualified pilot who desires to provide pilotage service," (Decision on Remand at 15). To the contrary, "[v]oluntary" only means that the association must be a group of people "joined together for a certain purpose." (*Id.* at 12.) This interpretation strikes me as

10

reasonable and consistent with the Coast Guard's previously applied policy.  In fact, the only evidence in the record suggesting the Coast Guard's decision was based on a different interpretation of the word "voluntary" is Flyntz's March 2001 letter.  (*See* Flyntz letter, 03/07/01 (JA 120).)  However, as the Coast Guard explained in its decision on remand, Flyntz's decision was appealed and affirmed on much narrower grounds.  Although the Court of Appeals made frequent reference to the Flyntz's decision, it understandably did not make a finding that his decision was supported by the record.  To the contrary, upon closer review, it appears to this Court that the Flyntz' expansive rhetoric was, at best, abnormal.  "Flyntz's letter was never an authoritative statement of the agency's interpretation of the phrase 'voluntary association.'" (*See* Decision on Remand at 10.)  Indeed, the Coast Guard itself characterized it as such and pointed out how it was inconsistent with "more than forty years of regulating Great Lakes pilotage." (*Id.*)  Small wonder "it was quickly superseded by the final agency action of Mr. High," (*id.*),[6] which was based on the very C.F.R. Section that allows the Director to order a non-Association member to provide pilotage service when the Association is not providing services "because of a physical or economic inability to do so."  46 C.F.R. § 401.720(b).

---

[6]Menkes asserts that if this Court determines it cannot rely on Flyntz's decision because it was appealed, it also cannot rely on Wasserman's decision, because it was also appealed.  However, as the Coast Guard explains, to the extent Flyntz's decision is broader than Mr. High's, it was not accepted by the Coast Guard, whereas Wasserman's decision was both affirmed and relied on by the Coast Guard. (Def's Mem. in Support of Mot. for Summ. J. [Dkt. # 23] at 15.)

For all of these reasons this Court finds the Coast Guard's interpretation of "voluntary" was reasonable and consistent with its previously applied policy.

### 2.    Extraordinary Circumstance

As Gilmour noted in his April 12, 2004, letter, Menkes was dispatched as an independent pilot by the Director based on "his determination that the [Association] could not physically provide adequate pilotage service and there was a serious need for additional qualified pilots in District One." (Gilmour letter, 04/12/04 at 1 (JA 58).) According to Gilmour, Menkes's "continued service as an independent pilot was, and is, contingent upon that extraordinary circumstance remaining in effect." (*Id.*) The Court of Appeals, based on the record before it, questioned whether the Coast Guard's use of the phrase "extraordinary circumstance" meant that there was another prerequisite to Menkes's service in addition to the Association's "physical or economic inability" to provide service. *Menkes*, 486 F.3d at 1310–14. The Court of Appeals also seemed to question whether this was a reasonable interpretation of the regulation. *Id.*

Menkes, of course, asserts that the Coast Guard was applying this "extraordinary circumstance" and that this standard is a stricter standard than that which the regulation contemplated. In that regard he specifically notes that "extraordinary circumstance" could not have been synonymous with the Association's inability to provide services because the Association was unable to provide services the previous three seasons as well. (Pl's Cross-Mot. at 29–30.)

12

However, on remand the Coast Guard further explained that a separate "extraordinary circumstance" did *not* need to be determined as a supplemental to the Association's "physical or economic inability" to provide pilotage services. (*See* Decision on Remand at 22.) Indeed, as Wasserman explained in his post-remand declaration, the phrase "extraordinary circumstances" is the phrase he believed fairly characterized a situation "[f]or more than forty years" whereby the Coast Guard had to give associations primary responsibility for providing these services. (Wasserman Decl. ¶ 4.) Furthermore, before appointing Menkes, the Coast Guard had not used its authority to order a non-Association member to provide services. (*Id.*) Moreover, Gilmour himself used that phrase in his April 2004 letter that to describe this situation where "*a pool is not providing pilotage services*," thereby necessitating "the Director to take action to order any U.S. registered pilot to provide pilotage services." (Gilmour letter, 04/12/04 (JA 58) (emphasis added).) Gilmour also noted that Menkes's "continued service as an independent pilot was, and is, contingent upon *that extraordinary circumstance* [when the Association 'could not physically provide adequate pilotage service'] remaining in effect." (*Id.*) For these reasons, the Court finds the Coast Guard did not, and will not, impose a higher threshold for service than that contemplated by the regulation.

### 3.    Naturally Expired

Next Menkes characterizes the Coast Guard's decision to let his appointment "naturally expire" at the end of 2003. *Menkes*, 486 F.3d at 1310. Menkes would like this

Court to believe that the Coast Guard gave him a permanent appointment to be dispatched as an independent pilot and therefore, Flyntz's opinion that it would "naturally expire" at the end of the 2003 season represents a sharp change in agency policy and is therefore arbitrary and capricious. I disagree. Putting aside the broad language in Flyntz's decision that was never an authoritative statement of agency policy, the Coast Guard has consistently explained that its authority to appoint Menkes was predicated on the Association's inability to provide adequate services. (High letter, 05/22/01 (JA 114); Wasserman letter, 10/22/03 (JA 83–84).) It was therefore unreasonable for Menkes to believe he had a permanent appointment to provide services. Indeed, when Wasserman learned at the end of 2003 that the Association would likely be able to provide services for the 2004 season, he limited his order for Menkes to provide services for the remainder of the 2003 season. He also stated he would nevertheless continue to monitor the Association's abilities to provide services and even held out the possibility that Menkes could be ordered to provide services later. Wasserman's conclusion that his order would naturally expire at the end of the 2003 season is both consistent with previous Coast Guard policy and the Coast Guard's belief that it lacked authority under the regulation to dispatch Menkes unless the Association was incapable of providing services.

Next, the Court of Appeals directed the Coast Guard to elaborate its reasons for finding the Association would likely be able to provide services for the 2004 season. It did. Specifically, the Court of Appeals directed the Coast Guard to square its conclusion

14

that the Association would have the ability to provide services for the 2004 season, with its determination at the end of 2003 that the Association was still having difficulties in providing the necessary services. *Menkes*, 486 F.3d at 1314. In that regard, our Circuit Court commented that the Coast Guard's explanation would need to include "specific comparisons" between the two seasons in order to adequately explain its decision. *Id.*[7]

In response, the Coast Guard noted that while the Association was having difficulties providing adequate pilotage services at the end of 2003, (Wasserman letter, 12/29/03 at 2 (JA 66)), the evidence available at the time indicated the Association would be able to provide adequate services for the 2004 season. Specifically, there was a downward trend in vessel traffic between 2001 and 2003, and no more than six pilots were needed in the relevant area of the Great Lakes during those years. Indeed, Menkes himself recognized this downward trend, as he wrote in a July 2003 letter that the Association had too many pilots for the amount of traffic. (Decision on Remand at 28–32.) Also, while the Association had a pilot-attrition problem in one geographic area, it had too many pilots serving in another. (Wasserman Decl. ¶ 11.) Thus, for the 2004 season, unlike seasons before, the Association came up with "a workable plan to address"

---

[7]This Court concludes that the Coast Guard's determination that the Association was not able to provide services in 2003 but may be able to provide services in 2004 is a reasonable determination. However, even if the Coast Guard did not determine the Association could provide adequate services, this Court is not convinced the Coast Guard would be *required* to dispatch Menkes. The regulation provides only that the Coast Guard "may" order a pilot to provide services in the event that the Association is unable to do so, not that the Coast Guard is required to do so. 46 C.F.R. § 401.720(b); (*see also* Decision on Remand at 16.)

the attrition problem. (*Id.*) Moreover, the Association expected additional pilots would be available to serve. (*Id.* ¶ 18.) In fact, Wasserman himself was in the process of completing the pilotage projections for the 2004 season, which eventually determined the Association had more than enough pilots to meet demand. (*Id.* ¶ 12.) Thus, based on these comparisons, the Coast Guard found the Association would likely be able to provide adequate services for the 2004 season.

Menkes argues nonetheless that Wasserman's findings were not specific enough and that he instead "acted upon an expectation or hope" that the Association would be able to provide adequate pilotage service. (Pl's Cross-Mot. at 26.) I disagree. This Court has no basis to impose on the Coast Guard a requirement of absolute certainty. Indeed, to impose such a requirement would be contrary to the "good deal of deference" this Court must accord to the Coast Guard's determination of "whether the association was physically or economically able to provide adequate service" under the arbitrary and capricious standard. *Menkes*, 486 F.3d at 1313.

Thus, for all of the foregoing reasons, this Court finds that the agency's decision—that Menkes's order for dispatch would expire and resume if the Coast Guard determined the Association was incapable of providing adequate pilotage services—was reasonable and in accordance with the Coast Guard's consistent interpretation of the regulation.

## II.     First Amendment Claim

Regarding Menkes's First Amendment claim, he argues the Coast Guard violated his right to refuse to associate by conditioning his right to being dispatched as a pilot upon his rejoining the Association. (Pl's Cross-Mot. at 35.) This claim, however, is precluded by the Second Circuit's decision in *Menkes v. St. Lawrence Seaway Pilots'* *Association*, 269 Fed. Appx. 54 (2d Cir. 2008), a case in which Menkes alleged the Association violated his First Amendment association rights. Regarding this claim, the Second Circuit held "[w]ithout violating the Constitution, the government can compel an individual to join a professional association as a condition of employment." *Id.* at 56.

This Court finds, based on the Second Circuit's decision, that issue preclusion bars Menkes from raising his First Amendment claim in this case. "'[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a different cause of action involving a party to the first case.'" *Yamaha Corp. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). The three elements of issue preclusion are established here. First, Menkes is raising the same issue as he did in his Second Circuit case. Second, the First Amendment issue was "actually and necessarily determined by" the Second Circuit. And finally, applying preclusion in this case would "not work a basic unfairness to" Menkes. *Id.* Therefore, this Court finds Menkes is precluded from raising his First Amendment claim in this case. *See Amore ex*

17

*rel. Estates of Amore v. Accor, S.A.*, 484 F. Supp. 2d 124, 129 (D.D.C. 2007) (applying preclusion to a plaintiff's complaint because it "alleges the same facts and raises the same legal issues as the action in New York").

### III.   Due Process Claim

Finally, the Court of Appeals found that Menkes's due process claim under the Fifth Amendment "raises quite troublesome issues" and that "if it were showing that [Menkes] had a property interest in such assignments as the pilotage pool could not meet, then he would be entitled, under the Fifth Amendment, to a further hearing to determine whether conditions constituting adequate pilotage service *actually* existed." *Menkes*, 486 F.3d at 1315. Menkes, however, has *not* shown he has a property interest in serving as an independent pilot.

As noted above, the Coast Guard explained repeatedly that he was only able to provide services as an independent pilot *if* the Association was unable to do so. Menkes therefore objectively knew that his continued appointment was conditional. Menkes attempts to rely on Flyntz's statement that Menkes "has a vested property right in his certificate of registration" as the basis for his contention. Unfortunately for him, however, Flyntz's statements did not represent Coast Guard policy. Furthermore, even assuming Flyntz's statements were authoritative, the statement at best created a property interest in Menkes's *certificate of registration*, not in his continued appointment. The Coast Guard's decision only affects his ability to be dispatched in a specific area of the

18

Great Lakes.  It has no effect on his certificate of registration.  Thus, even if Menkes has

a property interest in his certificate of registration, he does not have a property interest in

in serving as a pilot in a specific area.  *See Cafeteria and Rest. Workers Union v.*

*McElroy*, 367 U.S. 886, 896 (1961) (denying a plaintiff's Fifth Amendment claim

because she "remained entirely free to obtain employment [elsewhere].  All that was

denied her was the opportunity to work at one isolated and specific [location]").

Accordingly, Menkes's due process claim must also fail.

## CONCLUSION

For all of the reasons stated above, this Court will GRANT the Defendants'

Motion for Summary Judgment and will DENY the Plaintiff's Cross-Motion for

Summary Judgment.  An Order consistent with this decision accompanies this

Memorandum Opinion.

RICHARD J. LEON
United States District Judge